IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF CALIFORNIA


    ROBERT MANN, et al.,

                 Plaintiffs,
                                        Case No. 2:17-cv-1201
            vs.
                                        Sacramento, California
    CITY OF SACRAMENTO, et              September 18, 2017
    al.,                                1:30 p.m.

                 Defendants.     /
    _____


                          MOTION HEARING
                BEFORE THE HONORABLE WILLIAM B. SHUBB
                 UNITED STATES DISTRICT SENIOR JUDGE

    APPEARANCES:

    For the Plaintiffs:          LAW OFFICE OF MARK E. MERIN
                                 BY:  MARK E. MERIN
                                 1010 F Street, Suite 300
                                 Sacramento, California 95814

    For the Defendants:          ANGELO, KILDAY & KILDUFF, LLP
                                 BY:   JOHN A. WHITESIDES
                                 601 University Avenue, Suite 150
                                 Sacramento, California 95825

                                       and

                                 CITY OF SACRAMENTO
                                 CITY ATTORNEY OFFICE
                                 BY:   SEAN D. RICHMOND
                                 915 I Street, 4th Floor
                                 Sacramento, California 95814


    Court Reporter:              DIANE J. SHEPARD, CSR 6331, RPR
                                 Official Court Reporter
                                 501 I Street, Rm 4-200
                                 Sacramento, California 95814
                                 (916) 554-7460

    Proceedings reported by mechanical stenography, transcript
    produced by computer-aided transcription.

1          THE CLERK:  Item two, 17-1201, Robert Mann, et al.,

2    versus City of Sacramento, et al.  Counsel, your appearances.

3          MR. MERIN:  Good afternoon, Your Honor.  Mark Merin

4    for the plaintiff siblings of Joseph Mann, and they are present

5    in court.

6          THE COURT:  Would you like to switch places?  I'm used

7    to seeing the plaintiff on the other side.  I may accuse you of

8    being counsel for the defendant.

9          MR. MERIN:  Thank you, Your Honor.

10          MR. WHITESIDES:  John Whitesides, Your Honor, for

11    Officers John Tennis and Randy Lozoya.

12          THE COURT:  We have two motions here.  One is the

13    motion of the defendants to dismiss, and the other is the motion

14    of the plaintiff to strike certain affirmative defenses.  Why

15    don't we take the motion to dismiss first.

16          MR. WHITESIDES:  That would be good, Your Honor,

17    because that's the only one I'm here for.

18          THE COURT:  What about the other one?

19          MR. WHITESIDES:  That would be Mr. Richmond's client.

20          THE COURT:  So let's take yours.

21          MR. WHITESIDES:  Thank you, Your Honor.

22      Three Ninth Circuit cases have been cited to the court as

23    bearing on some aspect of the standing issue.  And if we go in

24    chronological order, we start with IDK, which states that an

25    association, a relationship, can be intimate, or it can be

1    expressive, or it can be both.

2        If it's intimate, then, typically, we're going to look to

3    the due process clause.  Not the First Amendment.  If it's

4    primarily associative, we're going to do the converse.  We're

5    going to look to the First Amendment -- or excuse me --

6    expressive, we're going to look to the First Amendment.  And

7    then if it has both features, then both amendments could apply.

8        Then we go forward in time.  We get to the next Ninth

9    Circuit decision in Ward, which solely addresses the due process

10   clause.  And Ward says siblings do not have standing to sue for

11   deprivation of familial association.

12       And then finally we come to Lee.  And Lee, which involves

13   the mother and son, says, rather tersely, the mother states a

14   claim under both the First and the Fourteenth Amendments without

15   any real analysis and certainly without saying what, if any,

16   difference there would be between the two claims or whether they

17   are identical.

18       And in the reply brief, we noted that one of the reasons

19   that Lee doesn't give us any more help is because the parties

20   didn't brief it.  If you read their appellate briefs, they are

21   completely silent on the subject of the familial association

22   claim.

23       So the court doesn't go very far because it doesn't need to.

24   Also, because it was a mother and son, we don't really have a

25   standing problem like the one that's being addressed in this

1   case.

2       Is there anything else that we can get out of Lee that's

3   helpful to the court in resolving this issue?  And I think there

4   is one other thing.

5       If we look at the panel opinion in Lee, where it's got the

6   heading of the familial association claim, and it talks about

7   the allegations that are germane to its analysis as to why a

8   claim is stated for the purpose of the motion, it doesn't focus

9   on the underlying conduct, which was the false imprisonment of

10  the son under a case of mistaken identity, and then he's

11  extradited to New York.  It focuses on what happens when the

12  mother tries to find him, and she makes these repeated

13  communications to the Los Angeles City Police that go unheeded.

14      And those are the only allegations that the panel

15  references.  I think that's significant because it tells us that

16  the panel is looking at the fact that there is a knowing,

17  intentional disruption that's going on.

18      Now that doesn't completely solve the dilemma of what are

19  the parameters of a First Amendment claim, and to what extent

20  are they any different than a due process claim if we don't have

21  any expressive conduct.  But what it does do is tell us that Lee

22  is not controlling of this case because in this case we have no

23  allegations that there is any knowledge of any relationship

24  between the decedent and the plaintiffs.  His encounter is

25  random and without any regard to whether he's a person with a

1   family or without.

2       So my main emphasis, when we look at these cases, is, that

3   we don't see the Ninth Circuit indicating anywhere that you can

4   have standing in an adult sibling to sue for an incidental

5   deprivation.

6           THE COURT:  How do you deal with the Rotary Club case

7   and the Jaycees?

8       You started this discussion by making the distinction

9   between intimate relationship and an expressive relationship,

10  and correctly, sensibly pointing out that one might apply to the

11  Fourteenth Amendment, and the other would apply to maybe the

12  Fourth Amendment, and the other would apply to the First

13  Amendment.  But plaintiff alleges both here, right?

14          MR. WHITESIDES:  Right.

15          THE COURT:  But their point is, all we are seeking to

16  recover is under the First Amendment.  They are not asking to

17  recover under the Fourth Amendment as incorporated by the

18  Fourteenth.

19      So how do you deal with the Rotary Club and the Jaycees

20  where they seem to extend it to any number of relationships as

21  long as factually there is enough there?

22          MR. WHITESIDES:  The same way that the panel did in

23  IDK and that both the Sixth and the Seventh Circuits did in the

24  cases we cited.  The Sixth was Thompson.

25      And, basically, that analysis is that the parameters of

1   protection that the First Amendment is going to give to a

2   relationship depend upon the degree of intimacy.  And that when

3   we look at Roberts, we talk about child rearing --

4           THE COURT:  I know --

5           MR. WHITESIDES:  -- and co-habitating.

6           THE COURT:  -- but if you can have that degree of

7   intimacy in the Rotary Club, then certainly two siblings can

8   have it.

9           MR. WHITESIDES:  Yes.  But we would say, if you look

10  at the examples that the Ninth Circuit gives, when it discusses

11  Roberts, of the protection, it's talking about within the same

12  home.

13          THE COURT:  I know.  But how do you deal with these

14  cases?  They are not confined to the same home.

15      The Supreme Court, when they want to reach a certain result,

16  sometimes they say things that people are going to quote in

17  other contexts, and that is exactly what happened here.  They

18  wanted to make sure women got admitted to the Rotary Club.  But

19  they said a lot of things that are going to apply in other

20  cases.

21      Here is the language from -- this is from Roberts, and I

22  think it's quoted in the Rotary Club.  "Implicit in the right to

23  engage in activities protected by the First Amendment there is a

24  corresponding right to associate with others."

25      And then the Rotary Club says:  "The First Amendment

1    protects those relationships, including family relationships" --

2    not only within family relationships -- "that presuppose deep

3    attachments and commitments to the necessarily few other

4    individuals with whom one shares not only a special community of

5    thoughts, experiences, and beliefs, but also distinctively

6    personal aspects of one's life."

7         That is about as wishy-washy as you can get.

8              MR. WHITESIDES:  Yes.

9              THE COURT:  But that's the language they chose to use

10   in order to get to the result that they wanted.

11        You're stuck with that language.  Now that certainly doesn't

12   limit itself to family relationships, much less limits itself to

13   the relationships between parents and children.

14             MR. WHITESIDES:  But what the Ninth Circuit does with

15   that language in IDK is say that if it's intimacy that is the

16   predominant theme, which would typically be so in a family

17   setting, that the due process clause is going to be the

18   governing one.

19             THE COURT:  You think IDK says that?

20             MR. WHITESIDES:  Yes.  I can absolutely quote it.  The

21   part of IDK that says --

22             THE COURT:  But what about expressiveness within the

23   family?

24             MR. WHITESIDES:  The expressiveness that I think IDK

25   is talking about is the one that the First Amendment normally

1    goes to, which would be expressiveness that relates to a certain

2    speech-related component that is protected, whether it be to

3    petition, or whether it would be to express a political view or

4    religious view.  It wouldn't be, "hi, honey, how is your day

5    going?"

6         THE COURT:  Well, maybe, maybe not.  What I'm getting

7    at is whether this really has to be decided on a case-by-case

8    basis.

9         One person might say it's just, "honey, how's your day?"

10   And we loved each other, and we had that kind of relationship

11   that one would call intimate.

12        Another person might say my wife, my brother, or someone

13   else was my confidant, and we spoke regularly, and we exchanged

14   ideas.

15        Now, if that's the case, can we say that IDK or any other

16   case limits that person's right to bring the action?

17        MR. WHITESIDES:  Well, I think we can.  Because logic

18   tells us that a relationship cannot be intimate in a

19   constitutional sense without some degree of communication.

20        So when they talk about separating a predominantly intimate

21   relationship from an expressive one, I think what they are

22   focusing on is, yes, there is some communication, of course, and

23   deep emotional communication, but not communication of the type

24   that the First Amendment is normally protecting, which would be

25   more the expressive of ideas and concepts that go beyond the

1    normal family relation.

2        Otherwise, this language in IDK about distinguishing for the

3    purposes of the due process clause from the First Amendment is

4    meaningless.

5        The other problem that we have if we go in that direction,

6    Your Honor, is that then the holding in Ward becomes practically

7    a toothless tiger.  Because if every familial deprivation

8    automatically includes an expressive component by the mere fact

9    that they are family relatives, then standing always exists

10   under the First, and the fact that it doesn't under the

11   Fourteenth is meaningless.

12           THE COURT:  Maybe the damages are different under the

13   First than they are under the Fourth or Fourteenth.

14           MR. WHITESIDES:  It's the same deprivation, right?  I

15   mean, it's without that relative.

16           THE COURT:  Maybe the jury would decide that the loss

17   of the affection is more or less valuable than the loss of the

18   ability to communicate.

19           MR. WHITESIDES:  Well, I suppose that is theoretically

20   possible, Your Honor.  And I guess that gets us back to the

21   dilemma that the parties started with, which is there is no case

22   that delineates what the elements of a First Amendment familial

23   association claim are.

24           THE COURT:  Interesting.

25       Mr. Merin, I would like you to particularly, in the course

1  of your response, answer the question:  Why make a distinction

2  between the Fourth and Fourteenth Amendment claim and the First

3  Amendment claim if you can always bring a First Amendment claim?

4          MR. MERIN:  Well, I start with the cases that Your

5  Honor averted to, the Jaycees and the Rotary Club case, because

6  there the Supreme Court is really saying how sacred the family

7  relationships are.

8      I think the quote that you read, "The First Amendment

9  protects those relationships, including family relationships,

10  that presuppose deep attachment and commitments to the

11  necessarily few other individuals with whom one shares not only

12  a special community of thoughts, experiences, and beliefs, but

13  also distinctive personal aspects of one's life."  And that's

14  the guidance that the court has given our circuits and our

15  district courts.

16      And, here, it was Ward that said, well, the Fourteenth

17  Amendment is not going to be extended to cover siblings.  The

18  Fourteenth -- substantive due process.

19          THE COURT:  They never make that clear as to why they

20  are limiting it to children.

21          MR. MERIN:  Exactly.  They do not make it clear at

22  all.  They don't make it clear.  They just recite that, and they

23  recite it after struggling with the distinction between the

24  Milwaukee case and the Trujillo case.

25          THE COURT:  That's the question that I wanted you to

1    address.

2        Why go to all the trouble to limit your Fourth and

3    Fourteenth Amendment claims to parents and children, and then

4    say, oh, but you can bring a First Amendment claim for any

5    family relationship?

6            MR. MERIN:  Well, I think that, first, for parent and

7    children and those claims under the substantive due process of

8    the Fourteenth Amendment, they also are recognized under the

9    First Amendment.

10       In fact, that's what Lee said.  It's both First and

11   Fourteenth Amendment decision.  That's what your brother on the

12   court, Judge Nunley, said.  First and Fourteenth Amendments both

13   are suitable as a vehicle for the defense of -- or the

14   litigation of sibling rights.

15           THE COURT:  Then didn't he restrict the First

16   Amendment to the same individuals that were covered by the

17   Fourteenth Amendment?

18           MR. MERIN:  No, Your Honor.  I mean, in that case

19   there were siblings who were found to have standing to sue.

20   Siblings of the deceased.  Mr. Parminder Shergill.

21           THE COURT:  Didn't Judge Nunley throw the case out?

22           MR. MERIN:  No, Your Honor.  Not at all.

23           THE COURT:  That was a case where Judge Burrell had it

24   on a motion to dismiss, and then Judge Nunley had it later on a

25   motion for summary judgment, right?

1          MR. MERIN:  No.  The -- this case is not -- well,

2     maybe you know more than I.  It's under submission for summary

3     judgment.

4          THE COURT:  What case are we talking about?

5          MR. MERIN:  That is the Shergill or Kaur case, Your

6     Honor.

7          THE COURT:  That's the one I'm talking about.

8          MR. MERIN:  Oh, I'm sorry.  You're right.

9       Not all the issues have been decided, but summary judgment

10    was decided, and it was decided for us.  But, no, the First

11    Amendment issue was not thrown out.  Not at all.

12         THE COURT:  Okay.

13         MR. MERIN:  But also on the same court --

14         THE COURT:  I want to make sure.  Do you have the Kaur

15    case there?  No.

16      Okay.  Never mind.  I thought -- I can go back and look at

17    this.  I thought Judge Burrell had the case on the motion to

18    dismiss.

19         MR. WHITESIDES:  Yes.

20         MR. MERIN:  Yes.

21         THE COURT:  And he denied the motion to dismiss.

22         MR. WHITESIDES:  Yes.

23         THE COURT:  And then it went to Judge Nunley, and

24    Judge Nunley got it on motion for summary judgment, and he

25    granted the motion for summary judgment.  No?

1          MR. WHITESIDES:  No.  There is a footnote where he

2    carves out certain issues as raised in the reply brief.  And

3    that was our position.  It's not a definitive disposition of the

4    issues.

5          THE COURT:  So Judge Nunley decided the case the same

6    way Judge Burrell did.

7          MR. MERIN:  Yes.

8          MR. WHITESIDES:  He didn't say anything expressly

9    about siblings one way or another.  Judge Nunley.

10         MR. MERIN:  Well, siblings, who are the plaintiffs,

11   Your Honor, and they moved to dismiss those claims.

12      So I just -- all I wanted to do was to cite in fact Judge

13   Nunley as recognizing and permitting claims of siblings to go

14   forward.

15      In the same context, Judge Morrison England, in the Graham

16   case, discussed the First and Fourteenth Amendments and their

17   applicability, and he found that there was a First Amendment

18   familial association claim.

19      Now it was lost.  That case was lost on summary judgment.

20   But that's a different matter.  We're before Your Honor on a

21   motion to dismiss.

22      And what we're saying is it's clear from the statements of

23   the Supreme Court and the applications of these principles, both

24   at the circuit and district courts, that siblings have a right

25   to come into court and prove their loss.

1          THE COURT:  Can I ask you for the third time?  Maybe

2    there is no answer.

3       If that's the case, why go to all the trouble to limit the

4    Fourth and Fourteenth Amendment claims to parents and children

5    if siblings can come in on the First Amendment and bring the

6    same claims?

7          MR. MERIN:  That's a good question, Your Honor.  And I

8    see how issues such as this are dealt with differently in

9    different circuits, and sometimes it boggles the mind as to how

10   they --

11         THE COURT:  Well, this is the Supreme Court.

12         MR. MERIN:  Well, it happens in the Supreme Court,

13   too.  It's sometimes quite confusing.

14      But I think that the rationale that the court used to draw a

15   line under the Fourteenth Amendment as to how far this can go

16   was a practical issue.  They were looking at, well, gee, if we

17   allow anybody, basically, to sue under the Fourteenth Amendment,

18   then there is no control.

19      So it's substantive due process.  They looked at these very

20   important fundamental rights that they thought were clear.  And

21   mother/son or parent/child, child/parent were of that ilk.  They

22   said that's clear.  Substantive due process.  We're going to

23   find this right is protected by the Constitution.  They didn't

24   at the same time consider the First Amendment.

25         THE COURT:  No, they didn't.  But if all they were

1    talking about was clarity, as you said, practicality, and so

2    forth, wouldn't the same considerations apply in a First

3    Amendment case?

4             MR. MERIN:  No.  Because then you had a fiance step

5    forward and say when my fiance was killed, I was damaged perhaps

6    even more significantly than the parent.  And they said, you

7    know, you're right --

8             THE COURT:  Supreme Court or the Ninth Circuit?

9             MR. MERIN:  No.  This was -- that wasn't Lee --

10            MR. WHITESIDES:  It was a district court case.

11            MR. MERIN:  Yes, it was a district court case.

12            THE COURT:  Well, anyway, I think there is no --

13            MR. MERIN:  That's the Graham case, Your Honor.

14   Sorry.

15        But they were really looking at something very important,

16   that is, the close relationships, the nature of those

17   relationships that warrant protection.  And this is a standing

18   question.  This is not a damages question.

19        And Your Honor may legitimately ask, well, gee, if we extend

20   it to siblings, how do we cut it off?  Is the neighbor included,

21   too?  Because they had some backyard conversations.

22        And I think that the reality is that people who had only

23   some kind of passing familiarity with the deceased that we're

24   talking about, a deceased situation, are unlikely to come

25   forward and say I want damages because --

1          THE COURT:  Well, you don't know who is going to come

2    forward and say they want damages.  If they know they can, a lot

3    of people will.

4          MR. MERIN:  Yeah, but if all they can get --

5          THE COURT:  Somebody could say that was my pastor.  I

6    used to confess to him every Sunday.  That was communication.

7    I've been denied my right of association with my pastor.

8          MR. MERIN:  What I was going to say, the end of my

9    sentence, Your Honor -- maybe you read me as having concluded --

10   but the end of it is that by restricting this to the family,

11   those relationships, the family, the nuclear family, the

12   intimate connection, the people with whom they live, they grew

13   up, they depended upon.

14       In the instance of the Mann family, the siblings in fact

15   were saying that Joseph was as a son to me legitimately because

16   they were the ones who actually raised him.

17         THE COURT:  But if you're asking this court to limit

18   it to the family --

19         MR. MERIN:  I'm asking this court not to limit it to

20   the family, but to include the family and to recognize their

21   First Amendment rights.

22         THE COURT:  What was going to be your answer when you

23   said the backyard neighbor and I said the pastor?

24         MR. MERIN:  I was going to say that those are not the

25   type of intimate relationships which the court spoke of when it

```
 1    gave examples.  The Supreme Court --

 2              THE COURT:  They extended it to the Rotary Club.

 3              MR. MERIN:  I think it distinguished, actually.  In

 4    the Rotary Club, it distinguished the nature of the relationship

 5    there among the members of the Rotary from the intimate

 6    relationships that are found in the family.

 7              THE COURT:  They said it was protected.

 8              MR. MERIN:  Those are protected.  But that's why they

 9    said you couldn't keep the women out, Your Honor.

10              THE COURT:  Right.

11              MR. MERIN:  Because it wasn't interfering with those

12    intimate associations.  Because the Rotary Club is not the

13    intimate organization or structure that a family is.

14              THE COURT:  I see what you're saying.  They said you

15    have to let women in because your association in the Rotary Club

16    is not protected.

17              MR. MERIN:  Exactly, Your Honor.

18         In fact, originally, the members of the Rotary Club said,

19    you know, we're -- this interferes with our association because

20    we want to just have a brotherhood of men.  We do men stuff.

21    And to inject women is going to prevent us from doing that.  And

22    it would interfere with our First Amendment rights.

23         And the court said no.  Yes, families have these rights.

24    And, yes, you can bring those under the First Amendment, and

25    they are protected.  But in this case, there is a distinction
```

1  between the Rotary and the family, and that's why women were

2  permitted.

3          MR. WHITESIDES:  That's correct, Your Honor.  The

4  court basically found a lack of intimacy in the relationships

5  among the Rotary Club members.

6      So we certainly agree on that point.  I think where we

7  disagree is how much you read into those statements by the

8  court.  If you look at the Supreme Court's actual holdings, none

9  of them go outside the home.  They are all dealing with

10  marriage, child rearing or co-habitation.

11      And the Sixth Circuit in a published opinion said, quote:

12  "The court has not extended constitutional protection to mere

13  visitation with family members.  Here, Thompson lived separately

14  from his family members."

15      So I think that's our point.

16          THE COURT:  Well, then why did Judge Nunley -- would

17  you address Judge Nunley's decision in Kaur?

18          MR. WHITESIDES:  Yes.  If you read footnote, I believe

19  it's seven, Your Honor, what he does is he talks about the

20  different plaintiffs.  There is a mother and then there's

21  siblings.

22      And in the footnote, he basically says there is an argument

23  made about the siblings in a reply brief.  I'm not going to

24  consider it because it was newly raised in the reply.

25      There is no analysis by Judge Nunley of the siblings'

1  standing issue that we're here arguing.  He just basically says

2  I'm not going to deal with it because it was raised in a reply

3  brief.

4      Now, what he does say, that you noted earlier, is, "I

5  conclude that the analysis is identical between the First and

6  the Fourteenth on the these familial association claims."

7      So how do you take that?  Let's assume that has persuasive

8  value because it's from down the hall.  How do you take that and

9  say, well, except for standing, and then they are totally

10  different.  Then you can have it under one but not under the

11  other.

12      So that's the problem.  That's the problem with giving the

13  face value to what Judge Nunley says is that it actually hurts

14  the plaintiffs' position.  It doesn't help it.

15      The other thing, if you looked at all the cases we cited,

16  whether they are in this circuit or out of this circuit, there

17  are many more cases that have said, no, you can't go under the

18  First Amendment, you have to go under the due process clause in

19  this situation, than cases that have.

20          THE COURT:  Just as a side issue.  You both keep

21  referring to the Fourteenth Amendment, due process clause.

22          MR. WHITESIDES:  Correct.

23          THE COURT:  Aren't we really talking about the Fourth

24  Amendment?  Aren't we talking about an excessive force case?

25          MR. WHITESIDES:  Well, as to the decedent.  But that

1    case is over.

2              MR. MERIN:  No.

3              THE COURT:  If the plaintiffs were to recover outside

4    the First Amendment, wouldn't they be proceeding on the Fourth

5    Amendment?

6              MR. WHITESIDES:  They don't have standing.

7              MR. MERIN:  That's not correct.

8         But what we're really talking about is a standard that is

9    applied.  And if it's substantive due process, we're looking at

10   intent to commit harm --

11             THE COURT:  And shocks the conscience.

12             MR. MERIN:  -- deliberate indifference.  That's the

13   standard by which they found that parents and children have

14   rights to proceed under 1983 for the death of a father or child.

15        And when we're talking about a First Amendment claim, you

16   look at, well, what's the unconstitutional action?

17        Now we're talking about the standard for deciding the

18   violation.  Not the standing.  Here, we're before Your Honor on

19   the standing question.

20        And they don't argue that the grievance doesn't meet the

21   standard to justify them proceeding.  But, clearly, you could do

22   it on the excessive force, and you could also do it as a shocks

23   the conscience.  You could do any one of those standards would

24   permit the siblings to go forward on a First Amendment claim.

25        Because the result of the action, the illegal conduct was to

1    interfere with their intimate relations with their sibling.

2    Those are ones that are presupposed.  That rise out of the

3    relationship.

4           MR. WHITESIDES:  I don't think that's the question the

5    court asked.

6        The question the court asked is, were the underlying rights

7    that they would try to assert Fourth Amendment rights?  The

8    answer to that is no.  The only party that could assert that

9    would be the estate on a survival claim.  That case is done and

10   over with.

11       The only way that these people could sue would be, in a

12   normal situation -- let's pretend that we're not here with

13   siblings.  So we don't have that problem.  Let's pretend that

14   we're here with the next of kin -- not the estate -- but the

15   next of kin.  It would be a Fourteenth Amendment due process

16   claim.  There could be not a Fourth Amendment claim because you

17   don't have standing to assert someone else's constitutional

18   rights.  Only your own.

19       The relatives' rights, in my hypothetical, where it's the

20   next of kin, let's say it's the son, would solely arise under

21   the due process clause.  So, no, you could not have a Fourth

22   Amendment claim in this case.

23           THE COURT:  Okay.  Thank you.  I will take the motion

24   under submission.

25           MR. WHITESIDES:  Thank you, Your Honor.

1              MR. MERIN:  Thank you, Your Honor.

2         Did you want to address the objections to the --

3              THE COURT:  All right.  Let's have the second team in

4    here.

5         Let me put it to you directly.  Your first three affirmative

6    defenses are based on state statutes, right?

7              MR. RICHMOND:  Yes, Your Honor.

8              THE COURT:  Can you have a state statute as an

9    affirmative defense to a Section 1983 action?

10             MR. RICHMOND:  Well, I would concede, Your Honor, that

11   affirmative defenses two and three in all likelihood would not

12   be applicable.

13        I would argue that potentially the first affirmative defense

14   would be.  And that is because that the Government Code

15   Section 820.2 does prohibit punitive damages against public

16   employees.  And following Monell, respondeat superior is not a

17   basis for rendering a municipality liable under 42 USC 1983.  So

18   I do believe that one perhaps could apply in this case.

19             THE COURT:  Tell me why.  Because that is a state

20   statute.  There is a federal law that relates to punitive

21   damages.  There are federal cases that relate to punitive

22   damages against public employees.  Why wouldn't we just apply

23   the federal law?

24             MR. RICHMOND:  Well, because I think that the -- that

25   the municipality liability provisions of 815.2, in conjunction

1  with the supplemental provisions of 42 1988 -- I mean, it can't

2  be allowed to construe a federal civil rights action against the

3  county.  So I believe that 815.2 could potentially apply here.

4         THE COURT:  That's what Section 1983 is all about.

5  That's why it was enacted back in the 1870s.  It's to provide a

6  federal remedy in cases where there are state statutes or

7  persons acting under color of state law that are relying upon

8  those state statutes to give them protection.  And Section 1983

9  says, no, you don't get those protections.

10        MR. RICHMOND:  Well, Your Honor, again, with a dispute

11  of law being more apt to be decided on a motion for summary

12  judgment, I mean, we did cite appellate authority in the

13  opposition papers that stood for that proposition.

14        THE COURT:  What proposition?

15        MR. RICHMOND:  That disputed laws -- or disputed

16  issues of law and fact are typically premature.

17        THE COURT:  No.  Disputed issues of fact are

18  premature.  Disputed issues of law are fair game for motions to

19  dismiss.

20        MR. RICHMOND:  Okay.  Your Honor, I will submit as to

21  one through three.

22        THE COURT:  Let me take it off you and put it on

23  Mr. Merin now.  What's wrong with their fourth affirmative

24  defense?

25        MR. MERIN:  Well, the fourth affirmative defense is

1    really a challenge to our ability to establish our claim.

2         THE COURT:  Well, what they are saying, and I may be

3    putting words in their mouth there, is, if the officers acted in

4    self-defense, then you cannot have a Monell claim against the

5    county.

6         MR. MERIN:  Well, if it's found, then we would have no

7    claim.  Yes, if they operated -- if they acted in self-defense.

8         THE COURT:  Well, I think that's what they are saying

9    in their fourth affirmative defense, isn't it?

10        MR. MERIN:  Well, that's not an affirmative defense.

11        THE COURT:  Self-defense is an affirmative defense.

12        MR. MERIN:  They say self-defense or defense of

13   others.  And I say it's a negative defense.  They're saying that

14   we failed to prove that we have a claim.

15        THE COURT:  You know, I've had this come up before.

16   And it's really in your best interests to say, all right, if you

17   want to take on that burden, and you want to say it's an

18   affirmative defense, I'll agree.  Now you've taken on the burden

19   of proving self-defense.

20      You're arguing right now the converse.  You're arguing,

21   well, gee, we have to prove that it wasn't in self-defense.  I

22   don't think that's the law.

23        MR. MERIN:  No.  I agree, Your Honor.  But as they

24   present their -- as the case is presented, the question is going

25   to be, for the jury, was this essentially a privileged shooting?

1   Was this unreasonable under the circumstances?

2           THE COURT:  But when you give the jury instructions to

3   me, you're going to be asking me to tell the jury that the

4   defendant has the burden of proving that it was in self-defense

5   or defense of others.  So that makes it an affirmative defense.

6           MR. MERIN:  I concede, Your Honor.

7           THE COURT:  So I think that you'll see the order.  I

8   think we're going to strike the first three, and we're going to

9   leave the fourth one in, if we get to that question.  Because if

10  there is no claim, we don't have to worry --

11          MR. MERIN:  It's a standing issue first, Your Honor.

12          THE COURT:  Thank you.

13      (End of transcript.)

14

15                          CERTIFICATION

16

17      I, Diane J. Shepard, certify that the foregoing is a correct

18  transcript from the record of proceedings in the above-entitled

19  matter.

20                          /s/ DIANE J. SHEPARD
                            DIANE J. SHEPARD, CSR #6331, RPR
21                          Official Court Reporter
                            United States District Court
22

23

24

25