1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   ROBERT MANN, SR., et al.        No. 2:17-cv-01201 WBS DB

13                Plaintiffs,

14        v.                          ORDER RE: DEFENDANTS' AMENDED
                                      MOTION TO DISMISS
15   CITY OF SACRAMENTO, et al.

16                Defendants.

17

18                         ----oo0oo----

19          Plaintiffs Robert Mann Sr. ("Robert"), Vern Murphy-Mann

20   ("Vern"), and Deborah Mann ("Deborah") (collectively,

21   "plaintiffs") brought this action against defendants City of

22   Sacramento, the Sacramento Police Department, Samuel D. Somers

23   Jr. ("Chief Somers"), John C. Tennis ("Officer Tennis"), and

24   Randy R. Lozoya ("Officer Lozoya") (collectively, "defendants"),

25   under 42 U.S.C. § 1983, seeking damages arising from the killing

26   of their brother, Joseph Mann ("Joseph"), by Officers Tennis and

27   Lozoya on July 11, 2016.[1]  (See Compl. (Docket No. 1).)

28          [1]    Plaintiffs' original complaint listed two additional

                                     1

1    Plaintiffs claimed that, by shooting and killing Joseph, Officers
2    Tennis and Lozoya had deprived them of their right of intimate
3    association with their brother under the First and Fourteenth
4    Amendments in violation of 42 U.S.C. § 1983.[2]  (See generally
5    id.)

6        Defendants moved to dismiss plaintiffs' complaint for
7    failure to state a claim upon which relief may be granted.  (See
8    Docket No. 12); Fed. R. Civ. P. 12(b)(6).  On September 19, 2017,
9    the court granted defendants' motion as to plaintiffs' § 1983
10   claim for loss of companionship under the Fourteenth Amendment,
11   as the Ninth Circuit has expressly limited such claims to parents
12   and children.  (See Docket No. 23); Ward v. City of San Jose, 967
13   F.2d 280, 283-84 (9th Cir. 1991).  The court denied defendants'
14   motion as to plaintiffs' claim under the First Amendment,
15   however, holding that, under applicable Supreme Court and Ninth
16   Circuit case law, plaintiffs had adequately alleged a § 1983
17   claim for deprivation of their First Amendment right to
18   association.  (See Docket No. 23); Bd. of Directors of Rotary
19   Int'l v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987); IDK,
20   Inc. v. Clark Cty., 836 F.2d 1185, 1194 (9th Cir. 1988).

21       Defendants appealed to the Ninth Circuit, which issued
22   a memorandum opinion reversing this court's decision as to

23   _____

24   siblings, Zachary Mann and William Mann, as plaintiffs.  (See
     Compl. ¶¶ 7-8.)  However, the operative complaint no longer
25   includes Zachary and William as plaintiffs.  (See First Amended
     Compl. ("FAC") (Docket No. 59).)

26        [2]    Plaintiffs also alleged a claim--not at issue in this
27   Order--for municipal and supervisory liability against the City,
     the Sacramento Police Department, and Chief Somers.  (See FAC
28   ¶¶ 107-112.)

2

plaintiffs' claims under the First Amendment.[3]  See Mann v. City
of Sacramento, 748 F. App'x 112 (9th Cir. 2018) ("Mann II").  The
Ninth Circuit explained that plaintiffs had failed to plead
sufficient facts to establish a violation of an "intimate
association" right protected under the First or Fourteenth
Amendments:

> Plaintiffs did not allege that their
> relationships with Joseph involved marriage,
> child rearing, or cohabitation, as in [Lee
> v. City of Los Angeles, 250 F.3d 668 (9th
> Cir. 2001)] or [Keates v. Koile, 883 F.3d
> 1128 (9th Cir. 2018)].  Nor did they allege
> specific facts about the 'objective
> characteristics' of their relationships with
> Joseph to show that they were nonetheless
> the sort of relationships that 'warrant
> constitutional protection.'

Mann II, 748 F. App'x at 115 (quoting Rotary Club, 481 U.S. at
545-46).  "Moreover," the court continued, "even if plaintiffs
could plead sufficient facts to satisfy the standards for
intimate association set forth in Rotary Club, relief would be
foreclosed under Ward v. City of San Jose, 967 F.2d 280 (9th Cir.
1991)."  Id.  The court noted that Ward had held that adult, non-
cohabitating siblings do not possess a cognizable liberty
interest in their brother's companionship.  See id.  "Because we
analyze the right of intimate association in the same manner
regardless whether we characterize it under the First or

---

[3]      The Ninth Circuit noted that, although this court had
not "explicitly address qualified immunity," the Ninth Circuit
had "jurisdiction over this interlocutory appeal of the district
court's denial of qualified immunity, Mitchell v. Forsyth, 472
U.S. 511, 525 (1985), as well as such issues are 'inextricably
intertwined' with the qualified immunity issue, Lum v. City of
San Joaquin, 584 F. App'x 449, 450-51 (9th Cir. 2014)."  Mann II,
748 F. App'x at 113.

Fourteenth Amendments, Ward necessarily rejected any argument that adult, non-cohabitating siblings enjoy a right to intimate association." Id.  The Ninth Circuit then remanded the case to this court to consider whether to grant plaintiffs leave to amend their complaint.  See id.

On remand, this court granted plaintiffs leave to amend, and plaintiffs timely filed a First Amended Complaint ("FAC"), adding a number of allegations related to their relationship with Joseph and to Joseph's living situation in the months preceding his death.  (See Docket No. 59.)  Defendants again moved to dismiss the complaint, arguing that, even with plaintiffs' amendments, the complaint still failed to state a claim for relief upon which relief may be granted.  (See Docket No. 61); Fed. R. Civ. P. 12(b)(6).  On March 13, 2019, the court granted defendants' motion.  (See Docket No. 70.)  Based on Mann II's statement that "even if plaintiffs could plead sufficient facts to satisfy the standards for intimate association set forth in Rotary Club, relief would be foreclosed . . . [because Ward] held that adult, non-cohabitating do not possess a cognizable liberty interest in their brother's companionship," Mann II, 748 F. App'x at 115 (emphasis added) (internal citations and quotation marks omitted), the court held that the FAC failed to state a § 1983 claim under the First Amendment because it failed to adequately allege that Joseph cohabitated with any of the plaintiffs at the time of his death.  (See Docket No. 70.)

Plaintiffs then appealed to the Ninth Circuit.  (See Docket No. 72.)  On April 30, 2020, a new panel issued a memorandum opinion, which again reversed the decision of this

4

1    court.  See Mann v. Sacramento Police Dep't, 803 F. App'x 142

2    (9th Cir. 2020) ("Mann III").  The Ninth Circuit first noted that

3    Mann II's statement that Ward would foreclose plaintiffs' § 1983

4    claim under the First Amendment "even if" they had pled

5    sufficient facts to satisfy Rotary Club was dicta, because Ward

6    neither created a cohabitation requirement nor purported to

7    govern First Amendment claims.  See id. at 143 (citing Trent v.

8    Valley Elec. Ass'n, Inc., 195 F.3d 534, 537 (9th Cir. 1999);

9    Ward, 967 F.2d at 284).  Rather, Ward had only addressed

10   Fourteenth Amendment intimate-association claims brought by adult

11   siblings.  See id.

12        The Ninth Circuit further stated that Mann II had

13   recognized that cohabitation was "one of several objective

14   indicia that courts may consider when assessing whether

15   plaintiffs were deprived of their intimate-association right"

16   under the First Amendment.  See id. at 143-44 (citing Rotary

17   Club, 481 U.S. at 545; Keates, 883 F.3d at 1236; Lee, 250 F.3d at

18   685-86; Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th

19   Cir. 1995)).  The court remanded the case "for consideration of

20   plaintiffs' First Amendment claim under the standard set forth in

21   Rotary Club and its progeny."  Id. at 144.

22        On remand, defendants renewed their motion to dismiss

23   the FAC for failure to state a claim0, and the parties submitted

24   updated briefs in light of Mann III.[4]  (See Defs.' Am. Mot. to

25   _____

26        [4]   Officers Lozoya and Tennis filed the motion to dismiss,
     which defendants City of Sacramento and Chief Somers joined in
27   its entirety.  (See Docket No. 93.)  Defendants City of
     Sacramento and Chief Somers also joined the reply brief of
28   Officers Lozoya and Tennis in its entirety.  (See Docket No. 96.)

1  Dismiss ("Mot. to Dismiss") (Docket No. 92); Pls.' Opp'n (Docket
2  No. 94); Defs.' Reply (Docket No. 95).)

3  I.  Legal Standard

4  Federal Rule of Civil Procedure 12(b)(6) allows for
5  dismissal when the plaintiff's complaint fails to state a claim
6  upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).
7  The inquiry before the court is whether, accepting the
8  allegations in the complaint as true and drawing all reasonable
9  inferences in the plaintiff's favor, the complaint has stated "a
10  claim to relief that is plausible on its face."  Bell Atl. Corp.
11  v. Twombly, 550 U.S. 544, 570 (2007).  "The plausibility standard
12  is not akin to a 'probability requirement,' but it asks for more
13  than a sheer possibility that a defendant has acted unlawfully."
14  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare
15  recitals of the elements of a cause of action, supported by mere
16  conclusory statements, do not suffice."  Id.  Although legal
17  conclusions "can provide the framework of a complaint, they must
18  be supported by factual allegations."  Id. at 679.

19  II.  Discussion

20  The court's discussion of whether plaintiffs have
21  adequately stated a § 1983 claim for deprivation of their First
22  Amendment rights is complicated by the fact that the Mann II and
23  Mann III decisions appear to be plainly contradictory.  While
24  Mann II stated that the right of intimate association should be
25  analyzed in the same manner regardless of whether it is
26  characterized under the First or Fourteenth Amendments, and that
27  Ward bars intimate association claims by adult, non-cohabitating
28  siblings, Mann III stated that Ward did not create a cohabitation

requirement, and addressed only Fourteenth Amendment association claims, implying that the contours of an intimate association claim may differ depending on which amendment the claim is brought under.

Because Mann III was decided more recently, this court will proceed according to the guidance set out in that decision. See Mann III, 803 F. App'x at 144.  Mann III did not purport to define exactly how far a claim for intimate association under the First Amendment extends, but the fact that the Ninth Circuit reversed this court's dismissal of plaintiffs' claim under the First Amendment (see Docket No. 70) implies that, at least in certain circumstances, the right of siblings to intimately associate falls within the First Amendment's ambit.[5]

This conclusion is supported by the Supreme Court's opinion in Rotary Club.  There, the Court was tasked with determining whether the relationship between members of the Rotary Club, an international fraternal organization of almost a million members, was sufficiently intimate to warrant protection under the First Amendment.  See Rotary Club, 481 U.S. at 539-40. The Court's analysis began by recognizing that "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"  Rotary

---

[5]   Were § 1983 claims by siblings categorically barred under the First Amendment, the Ninth Circuit presumably would have affirmed this court's dismissal of plaintiffs' claim.

1  Club, 481 U.S. at 545-46 (quoting Roberts v. United States

2  Jaycees, 468 U.S. 609, 622 (1984)).  Though the Court noted that

3  it had accorded constitutional protection to relationships

4  "includ[ing] marriage, the begetting and bearing of children,

5  child rearing and education, and cohabitation with relatives," it

6  indicated that this list was not exhaustive, and even pointed out

7  that it had "not held that constitutional protection is

8  restricted to relationships among family members."  Id. at 545

9  (collecting cases).  According to the Court, other relationships,

10  "including family relationships," may also be protected to the

11  extent that the "objective characteristics" of the relationship

12  demonstrate that it is "sufficiently personal or private to

13  warrant constitutional protection."  Id. at 545-46.  The Court

14  listed four factors it would consider in making such a

15  determination: "size, purpose, selectivity, and whether others

16  are excluded from critical aspects of the relationship."  Id. at

17  546 (citing Roberts, 468 U.S. at 620).

18         Applying these factors to Rotary Club members, the

19  Court concluded that the Club chapters' size (which ranged from

20  20 to 900 members), inclusive and public-facing nature and

21  purpose, and relative lack of selectivity and exclusion weighed

22  against affording constitutional protections.  Id.  Specifically,

23  the Court noted that the Rotary Club's Constitution directed

24  local chapters to "keep a flow of prospects coming" to make up

25  for attrition over time, undertake service projects to aid the

26  community and the general public, and to keep membership open to

27  all qualified members in the area.  See id. at 546-47.  The Court

28  further noted that local chapters' activities generally occurred

1    in the presence of strangers and in public places.  See id.

2           In the wake of Rotary Club, the Ninth Circuit has held

3    that the right to intimate association as guaranteed by the First

4    Amendment extends to parents and children, see Lee v. City of Los

5    Angeles, 250 F.3d 668 (9th Cir. 2001); Keates v. Koile, 883 F.3d

6    1128 (9th Cir. 2018), as well to unrelated, cohabitating

7    roommates, see Fair Housing Council of San Fernando Valley v.

8    Roommate.com, LLC, 666 F.3d 1216, 1221 (9th Cir. 2012) (applying

9    Rotary Club factors: "it's hard to imagine a relationship more

10   intimate than that between roommates" because the home forms the

11   "center of our private lives").  Other district courts in this

12   circuit have further held that siblings, see Smith v. County of

13   Santa Cruz, No. 17-CV-05095, 2019 WL 2515841, at *12 (N.D. Cal.

14   June 17, 2019), and fiancées, see Graham v. County of Los

15   Angeles, No. CV 10-05059 DDP (Ex), 2011 WL 3754749, at *2 (C.D.

16   Cal. Aug. 25, 2017), have a cognizable liberty interest in

17   intimate association and companionship under the First Amendment.

18   See also Sanchez v. County of Santa Clara, No. 5:18-cv-01871-EJD,

19   2018 WL 3956427, at **8-9 (N.D. Cal. Aug. 17, 2018) (holding that

20   grandparents and grandchildren have a liberty interest in family

21   integrity, without specifying whether this right arises under the

22   First or Fourteenth Amendments, or both).

23          Taken together, these cases show that the frequency and

24   significance of the interactions among parties to the

25   relationship at issue are key factors in determining whether the

26   right to intimate association is protected under the First

27   Amendment.  The relationships to which protection has been

28   afforded generally involve interactions that occur on a daily, or

                                    9

almost daily basis, and often involve intensely private exchanges, whether it be because the parties live together, see Fair Housing Council, 666 F.3d at 1221, or because some element of caretaking or custody is present, see, e.g., Sanchez, 2018 WL 3956427, at **8-9.

As the Supreme Court stated in Smith v. Org. of Foster Families for Equality and Reform, 431 U.S. 816, 844 (1977), a case where the Court suggested (though did not decide) that foster parents and children have a constitutionally-protected liberty interest in their association, "the importance of the familial relationship . . . stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children, as well as from the fact of blood relationship."

Likewise, in Fair Housing Council, the Ninth Circuit reasoned that roommates are entitled to protection under the First Amendment because they have "unfettered access to the home" and thus "learn intimate details most of us prefer to keep private," "note [their roommates'] comings and goings," and are "fully exposed to [their roommates'] belongings, activities, habits, proclivities, and way of life." Fair Housing Council, 666 F.3d at 1221. And in Sanchez, the district court held that the plaintiff grandparents had sufficiently alleged a liberty interest in associating with their grandchildren because they "spent a substantial amount of time living with" their grandchildren and had "established a long standing custodial relationship such that they were an existing family unit."

10

1    <u>Sanchez</u>, 2018 WL 3956427, at \*\*8-9.

2         A.    <u>Analysis of Factors under Rotary Club and its Progeny</u>

3              Applying the factors outlined in <u>Rotary Club</u> and its

4    progeny to the allegations in the FAC, it is clear that

5    plaintiffs' alleged relationship with Joseph was more intimate

6    and personal than that between members of a large fraternal

7    organization like the Rotary Club.  In terms of the first <u>Rotary</u>

8    <u>Club</u> factor, size, each plaintiff's relationship with his or her

9    brother involved only two people, and was enmeshed within a

10   "tightknit family unit" of five children and two parents.  (<u>See</u>

11   FAC ¶ 17.)  This is much more akin to relationships that the

12   Ninth Circuit has granted protection under the First Amendment,

13   <u>see</u>, <u>e.g.</u>, <u>Lee</u>, 250 F.3d at 685-86 (holding that parent and child

14   have a right to intimately associate under the First Amendment),

15   than the relationship among members of local Rotary Club

16   chapters, which could range in size anywhere from 20 to 900

17   members.  <u>See</u> <u>Rotary Club</u>, 481 U.S. at 546.

18             Looking next to selectivity, the Supreme Court held

19   that local Rotary Club chapters were not sufficiently selective

20   because they had instructions to "keep a new flow of prospects

21   coming" to make up for expected member attrition and gradually

22   grow the membership, and to keep the chapter open to all eligible

23   members in the area in order to ensure that the chapter was

24   comprised of a cross-section of different professions and members

25   of the community.  <u>See</u> <u>id.</u>  By contrast, plaintiffs' relationship

26   with Joseph was limited by blood.  <u>See</u> <u>id.</u>; <u>Smith</u>, 431 U.S. at

27   844 ("the importance of the family relationship . . . stems from

28   the emotional attachments that derive from the intimacy of daily

                                 11

association . . . as well as from the fact of blood relationship (emphasis added)).  While plaintiffs allege that they and Joseph shared intimate moments with their parents, or with plaintiffs' children (Joseph's nieces and nephews), these shared experiences extended only to other members of plaintiffs' nuclear family. (See FAC ¶¶ 17-19, 26.)

Defendants argue that the relationship between siblings cannot be characterized as "selective" because siblings, unlike spouses, fiancées, or parents, do not choose to form their relationship--that choice is made by their parents, for them. (See Mot. to Dismiss at 12 (citing Rode v. Dellarciprete, 845 F.2d 1195, 1204-05 (3d Cir. 1988)).  Without "affirmative choice" to form a relationship, defendants argue, there can be no "liberty" interest in intimate association to protect under the First Amendment.  (See Defs.' Reply at 1-3.)

While it is true that nobody chooses whom their blood siblings will be, siblings (particularly adult siblings) certainly have a choice in whether they will associate with one another, and how intimate that association will be.  Here, plaintiffs' allegations describe the efforts they and Joseph made to maintain an intimate relationship after they moved out of their childhood home.  Between 1986 and approximately 2009, after Joseph moved into his own place, plaintiffs allege that he continued to regularly visit them and play with his nieces and nephews, and that he regularly participated in family get-togethers.  (See id. at ¶ 26.)  Around 1999, Joseph invited his sister, Vern, to move in and live with him.  (See id. at ¶ 27.)

Following the death of their mother, in 2011, when

1    Joseph began to exhibit symptoms of mental illness, plaintiffs

2    Robert and Vern each invited Joseph into their homes, and he

3    split his living arrangements between them.  (See id. at ¶ 31.)

4    Plaintiffs further allege that they visited Joseph when he would

5    occasionally become hospitalized due to his mental illness, and,

6    on occasions when Joseph would "stay out, at times for several

7    days," plaintiffs would search for Joseph at places he habitually

8    frequented, and would bring him back to their homes to bathe,

9    rest, and eat.  (Id. at ¶¶ 32-35.)

10            These allegations show that, even as plaintiffs began

11   their own families, and even as Joseph's deteriorating mental

12   condition caused him to become more distant, plaintiffs actively

13   chose to keep Joseph in their lives and engaged in activities

14   emblematic of an intimate sibling relationship.  See Santa Cruz,

15   2019 WL 2515841, at *12 (noting that high-school-age siblings

16   were entitled to liberty interest in each other's companionship

17   in part because they continued to visit each other after moving

18   into separate homes); Sanchez, 2018 WL 3956427, at **8-9 (holding

19   that grandparents had protected liberty interest in associating

20   with grandchildren because they had chosen to "spen[d] a

21   substantial amount of time living" together and had "established

22   a long standing custodial relationship such that they were an

23   existing family unit").  The allegations in the FAC therefore

24   demonstrate that the relationship between plaintiffs and Joseph

25   was sufficiently selective to warrant protection under the Rotary

26   Club standard.  See 481 U.S. at 546.

27            By the same token, plaintiffs and their brother also

28   "excluded [others] from critical aspects of the relationship" by

                                  13

1   sharing intimate experiences in a way that only siblings or

2   parents and children can.  See Rotary Club, 481 U.S. at 546.

3   Plaintiffs allege that they "grew up" with Joseph "as a tightknit

4   family unit that lived, ate, played, and prayed together."  (See

5   FAC ¶ 17); Smith, 431 U.S. at 844.  The family attended church

6   regularly and had dinner together, "during which they routinely

7   discussed personal and religious matters."  (See FAC at ¶ 18.)

8   Plaintiffs shared the same family home with Joseph until 1980.

9   (Id. at ¶ 26.)

10          Between 1986 and approximately 2009, Joseph regularly

11  visited plaintiffs to play with their sons and daughters (his

12  nieces and nephews) and participated in family get-togethers

13  approximately once a week.  (Id. at ¶ 26-28.)  After Joseph began

14  experiencing symptoms of drug addiction in approximately 2015,

15  plaintiffs allege that Robert encouraged and assisted Joseph in

16  enrolling in Alcoholics Anonymous ("AA") and Narcotics Anonymous

17  ("NA"), and accompanied Joseph to meetings.  (See id. at ¶ 31.)

18  Plaintiffs also visited Joseph when he would become hospitalized,

19  supported him financially, and fed and housed him from 2015 up

20  until his death.  (See id. at ¶ 31.)  These allegations reflect a

21  relationship between plaintiffs and Joseph in which each sibling

22  shared "not only a special community of thoughts, experiences,

23  and beliefs but also distinctly personal aspects" of their lives.

24  See Rotary Club, 481 U.S. at 546.

25          Next, the "purpose" of the plaintiffs' relationship

26  with their brother (to the extent a sibling relationship has a

27  "purpose") further supports a finding that the relationship is

28  entitled to constitutional protection under the First Amendment.

14

See Rotary Club, 481 U.S. at 546.  Unlike the relationship
between Rotary Club members, which largely existed to "produce an
inclusive, not exclusive, membership," undertake service projects
to aid the community and the general public, "raise the standards
of the members' businesses and professions," and to "improve
international relations," Rotary Club, 481 U.S. at 546,
plaintiffs allege that their relationship with their brother
served as an "intimate human relationship[]" that necessarily
entailed "deep attachments and commitments."  (See FAC ¶ 104.)

        In support of this conclusion, plaintiffs detail the
efforts they and Joseph made to remain in each others' lives as
they reached adulthood and Joseph began to struggle with mental
illness and drug addiction.  (See FAC ¶¶ 26-35.)  For instance,
as already discussed above, plaintiffs invited Joseph to family
get-togethers approximately once per week, cultivated a
relationship between Joseph and his nieces and nephews, attended
NA and AA meetings with him, and "were in constant contact with
[him] and made sure he knew he was welcome in their homes."  (See
id.)

        Plaintiffs' relationship with Joseph also served a
caretaking purpose.  Plaintiffs allege that Joseph struggled with
symptoms arising from mental illness and drug addiction in the
later years of his life.  (See FAC ¶¶ 30-31.)  To help care for
Joseph, Robert alleges that he encouraged and assisted Joseph in
enrolling in AA and NA, and accompanied him to meetings.  (See
id.)  Plaintiffs also visited Joseph when he would become
hospitalized, supported him financially, fed him, and
intermittently housed him up until his death.  (See id. at ¶ 33.)

1    Notably, plaintiffs state that they would search for Joseph at

2    places he habitually frequented when he went missing for extended

3    periods of time, and would bring him back to their homes, where

4    he often stayed, to bathe, rest, and eat, indicating that

5    plaintiffs played a crucial role in looking out for Joseph's

6    well-being as he struggled with the symptoms of mental illness

7    and addiction.  (See id. at ¶ 35.)

8         While these allegations do not establish that

9    plaintiffs' relationship with Joseph was "custodial," the care

10   plaintiffs allege they provided for Joseph reflects the type of

11   intimate care and affection that exists among "existing family

12   unit[s]."  See Sanchez, 2018 WL 3956427, at **8-9.  The "purpose"

13   prong of the Rotary Club standard therefore weighs in favor of

14   granting Joseph and plaintiffs' relationship protection under the

15   First Amendment.  See Rotary Club, 481 U.S. at 546.

16        Finally, the frequency and significance of the alleged

17   interactions between Joseph and plaintiffs indicate that their

18   relationship is entitled to protection.  Plaintiffs allege that

19   they were in "constant contact" with Joseph, "made sure that he

20   knew he was welcome in their homes," and provided care to him in

21   the months leading up to his death by allowing him into the most

22   private areas of their lives.  (See FAC ¶¶ 29-35.)  Plaintiffs

23   state that Joseph left belongings in their homes, indicating that

24   he expected to return upon his departure.  (See id.)

25        Though, as this court has previously noted, these

26   allegations do not suffice to establish that Joseph "cohabitated"

27   with plaintiffs because they do not establish that Joseph had

28   independent access to plaintiffs' homes, contributed to the

16

1 maintenance of one or more of their homes, or that he rarely

2 slept outside of their homes, (see Docket No. 70), Mann III made

3 clear that, while cohabitation is relevant to a relationship's

4 status under the First Amendment, it is not necessary to

5 establish constitutional protection.  See Mann III, 803 F. App'x

6 at 143.  Even though plaintiffs cannot establish that they formed

7 an intimate relationship with Joseph by virtue of being

8 roommates, their allegations do evidence a relationship that was

9 similar to that of cohabitants in other ways.  See Fair Housing

10 Council, 666 F.3d at 1221.  For example, the allegations show

11 that both plaintiffs and Joseph were exposed to intimate details

12 about each other which most of us would prefer to keep private,

13 as well as each other's "belongings, activities, habits,

14 proclivities, and way of life," as plaintiffs attended AA and NA

15 meetings with Joseph and brought him back to eat, bathe, and

16 sleep in their homes after being out on the street.  See id.

17 　　　　　In sum, taking the allegations in the FAC as true and

18 construing them in their most favorable light, as the court must

19 do on a motion to dismiss, see Twombly, 550 U.S. 544, 570, the

20 court finds that plaintiffs have satisfied the factors set forth

21 in Rotary Club and its progeny, and have therefore shown that

22 their interactions with Joseph were sufficiently personal and

23 intimate to warrant protection under the First Amendment.  See

24 Rotary Club, 481 U.S. at 545; Fair Housing Council, 666 F.3d at

25 1221.

26 　　　　B.　　Direct and Substantial Interference with Plaintiffs'
　　　　　　　 Rights
27

28 　　　　　Defendants present an additional argument that, even if

1   the court finds that plaintiffs have a right to intimate

2   association with Joseph under the First Amendment, their claim

3   must nevertheless fail because the allegations in the FAC do not

4   show that the officers acted "directly" against their

5   relationship with Joseph.  (See Mot. to Dismiss at 15.)  In other

6   words, defendants argue that plaintiffs claims must fail,

7   regardless of the outcome of the court's Rotary Club analysis,

8   because plaintiffs do not allege that Officers Tennis and Lozoya

9   were aware of Joseph's sibling relationships when they shot and

10  killed him, and thus the Officers could not have acted with the

11  intent to deprive plaintiffs of their relationship with Joseph.

12  (See id.)

13        Defendants cite to Zablocki v. Redhail, 434 U.S. 374

14  (1978) for the proposition that government actors cannot be

15  liable for incidentally burdening a plaintiff's substantial

16  right; rather, the government actor must "directly and

17  substantially" interfere with that right.  (See Mot. to Dismiss

18  at 10.)  In Zablocki, the Supreme Court held that a Wisconsin

19  statute, which prevented certain classes of Wisconsin residents

20  from marrying, violated those residents fundamental right to

21  marry under the due process clause of the Fourteenth Amendment.

22  See Zablocki, 434 U.S. at 387.  In its opinion, the Court noted

23  that it was not preventing states from imposing regulations which

24  incidentally affected the right to marry or established

25  reasonable prerequisites--only regulations that "directly and

26  substantially" interfered with the right to marry were

27  prohibited.  See id.

28        However, Zablocki says nothing about what state of mind

18

a plaintiff must allege an officer had to maintain a § 1983 claim that the officer deprived him of a relationship protected by the First Amendment.  The Ninth Circuit has specifically rejected the imposition of a requirement that an officer act with the "specific intent" to deprive the plaintiff of his rights § 1983 claims brought under the Fourteenth Amendment.  See Smith v. City of Fontana, 818 F.2d 1411, 1420 n.12 (9th Cir. 1987) ("[T]he plaintiffs can state a section 1983 claim without further alleging that the official was trying to break up their family." (citing Kelson v. City of Springfield, 767 F.2d 651 (9th Cir. 1985)); Ward v. City of San Jose, 967 F.2d 280, 284 (9th Cir. 1992) (rejecting need to impose plaintiffs to "prove a wrongful intent directed specifically at them" in § 1983 claim for deprivation of relationship protected by the 14th Amendment).

Further, none of the cases in which the Ninth Circuit has recognized the existence of a § 1983 claim for deprivation of an intimate association right under the First Amendment has required that plaintiffs allege that officers specifically intended to deprive them of the protected relationship, or allege that the officers acted "directly" against that relationship. See Keates, 883 F.3d at 1236; Lee, 250 F.3d at 685-86.

If the Ninth Circuit intended for the lack of intent to deprive plaintiffs of their constitutional rights to be an independent bar to stating a § 1983 claim under the First Amendment, there would have been no reason for the Mann III panel to remand this case for further considerations under Rotary Club, see Mann III, 803 F. App'x at 144, as the FAC contains no allegations that the Officers intended to deprive the plaintiffs

1    of their constitutional rights, or that they even knew that

2    Joseph had siblings when they shot and killed him.  The court

3    therefore finds defendants' argument that plaintiffs' claim under

4    the First Amendment must fail because they have not alleged a

5    specific intent to deprive them of their constitutional rights to

6    be without merit.

7         Accordingly, the court finds that plaintiffs have

8    adequately pled a § 1983 claim for deprivation of their right to

9    intimate association under the First Amendment, and will deny

10   defendants' motion to dismiss on that basis.

11        C.   Qualified Immunity

12        Defendants further argue that, even if plaintiffs have

13   alleged sufficient facts to state a claim under the First

14   Amendment, their claim must be dismissed because Officers Tennis

15   and Lozoya are entitled to qualified immunity from suit.  (See

16   Mot. to Dismiss at 16-20.)  To determine whether an officer is

17   entitled to qualified immunity, the court considers: (1) whether

18   there has been a violation of a constitutional right; and (2)

19   whether the defendants' conduct violated "clearly established"

20   federal law.  Sharp v. Cty. of Orange, 871 F.3d 901, 909 (9th

21   Cir. 2016) (citing Kirkpatrick v. Cty. Of Washoe, 843 F.3d 784,

22   788 (9th Cir. 2016)).

23        The clearly established law inquiry "is an objective

24   one that compares the factual circumstances faced by the

25   defendant to the factual circumstances of prior cases to

26   determine whether the decisions in the earlier cases would have

27   made clear to the defendant that his conduct violated the law."

28   See Sandoval v. Cty. of San Diego, 985 F.3d 657, 674 (9th Cir.

20

1   2021).   In other words, the court asks whether "it would be clear

2   to a reasonable officer that his conduct was unlawful in the

3   situation he confronted."   Lacey v. Maricopa Cty., 693 F.3d 896,

4   915 (9th Cir. 2012); see also Ziglar v. Abbasi, 137 S. Ct. 1843,

5   1866 (2017) ("Whether qualified immunity can be invoked turns on

6   the 'objective legal reasonableness' of the official's acts."

7   (citation omitted)).

8        The only argument defendants offer as to why Officers

9   Tennis and Lozoya are entitled to qualified immunity is that the

10  plaintiffs did not possess a "clearly established" right to

11  intimate association with Joseph under the First Amendment at the

12  time of Joseph's death.[6]  (See Mot. to Dismiss at 16-20.)

13  Defendants cite to several out-of-circuit cases where courts have

14  granted qualified immunity on the ground that the plaintiffs did

15  not have a clearly established right to intimate association

16  under the First Amendment at the time of the conduct that gave

17  rise to the suit.   See, e.g., Starnes v. Butler Cty. Court of

18  Common Pleas, 50th Judicial Dist., 971 F.3d 416 (3d Cir. 2020);

19  Gaines v. Wardynski, 871 F.3d 1203 (11th Cir. 2017).

20       All of those cases upon which defendants rely involved

21  situations in which the plaintiffs bringing § 1983 claims were

22  also the individuals against whom the defendant's conduct had

23  been directed.  For instance, Starnes involved a probation

24  officer with the Butler County Court of Common Pleas who alleged

25  that the court's presiding judge had taken adverse employment

26  _____

27       [6]   Defendants do not argue that they are entitled to
    qualified immunity under the first prong of the qualified
    immunity analysis in either their motion to dismiss or reply.
28  (See Mot. to Dismiss at 16-20; Defs.' Reply at 6-10.)

1  actions against her in retaliation for her associating with her

2  boyfriend.  See Starnes, 971 F.3d at 422-23.  Those cases say

3  nothing about whether the proper focus of the court's inquiry in

4  a wrongful death action should be on the constitutional rights of

5  the plaintiff or of the decedent.

6      In none of those cases were the plaintiffs surviving

7  family members of individuals killed by police officers.  In such

8  cases, the Ninth Circuit has indicated that the proper focus of

9  the court's inquiry is on the constitutional rights of the

10 decedent, not those of the decedent's potential relatives, such

11 as parents or siblings.  See Porter v. Osborn, 546 F.3d 1131,

12 1140 (9th Cir. 2008) ("Thus, whether [defendant] is entitled to

13 qualified immunity . . . turns on whether [plaintiffs] can

14 present facts to the district court that would justify a jury

15 finding that [defendant] acted with an unconstitutional purpose

16 to harm [the decedent].").

17     The relevant question for the court under the second

18 prong of the qualified immunity analysis here is therefore

19 whether a reasonable officer would have known that his conduct

20 violated Joseph's clearly established rights, not those of the

21 plaintiffs.  See Kaur v. City of Lodi, 263 F. Supp. 3d 947 (E.D.

22 Cal. 2017) (Nunley, J.) (rejecting officers' assertion that they

23 were entitled to qualified immunity from survivors' First

24 Amendment intimate association claims under the second prong

25 because "qualified immunity does not give an officer who engages

26 in conduct that was patently unconstitutional when committed a

27 get-out-of-liability-free card because there is 'some lingering

28 ambiguity' as to which constitutional provision 'applies in this

22

1   precise context,' or whether he has managed to violate several

2   constitutional provisions at once" (citing <u>Harris v. City of</u>

3   <u>Circleville</u>, 583 F.3d 356, 367 (6th Cir. 2009)).

4           Since controlling Ninth Circuit precedent indicates

5   that the court must assess whether the Officers' conduct violated

6   Joseph's clearly established constitutional rights, and

7   defendants do not argue that a reasonable officer would have

8   thought that Officers Tennis and Lozoya's actions were lawful as

9   to Joseph under the second prong, (<u>see</u> Defs.' Reply at 10 (Docket

10  No. 95) ("this motion does not assert a reasonable officer could

11  have deemed the shooting lawful"), the Officers' request for

12  qualified immunity must be denied.  <u>See</u> <u>George v. Morris</u>, 736

13  F.3d 829, 837 (9th Cir. 2013) (affirming district court's denial

14  of qualified immunity where district court did not analyze the

15  second qualified immunity prong, because defendants had not

16  argued that they were entitled to qualified immunity on that

17  basis).

18          IT IS THEREFORE ORDERED that defendants' motion to

19  dismiss (Docket No. 92) be, and the same hereby is, DENIED.

20  Dated:  February 24, 2021

        WILLIAM B. SHUBB
        UNITED STATES DISTRICT JUDGE